No. 25-1520

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

THOMAS E. OVERBY, JR., INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED; ABBY GEARHART, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellees,*

v.

ANHEUSER-BUSCH, LLC,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Virginia at Newport News
Case No. 4:21-cv-00141-AWA-DEM

DEFENDANT-APPELLANT'S OPENING BRIEF

James E. Tysse
Robert G. Lian, Jr.
Margaret O. Rusconi
Katherine I. Heise
AKIN GUMP STRAUSS
  HAUER & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
202-887-4000
jtysse@akingump.com

*Counsel for Defendant-Appellant Anheuser-Busch, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 26.1(a), Defendant-Appellant Anheuser-Busch, LLC has no parent corporation. Defendant-Appellant Anheuser-Busch, LLC is an indirect subsidiary of Anheuser-Busch InBev SA/NV, which is a publicly traded corporation.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION .............................................................. 1

STATEMENT OF ISSUES ........................................................................... 1

INTRODUCTION .......................................................................................... 2

STATEMENT OF THE CASE ..................................................................... 4

    A.    Factual Background ................................................................ 4

    B.    This Lawsuit .......................................................................... 7

SUMMARY OF ARGUMENT ................................................................... 16

STANDARD OF REVIEW ......................................................................... 18

ARGUMENT ................................................................................................ 19

    I.    PLAINTIFFS FAILED TO MEET THEIR BURDEN UNDER RULE 23 ............................................................... 19

        A.    Individualized Inquiries Will Swamp Any Issues Common To The Putative Class ................................... 21

            1.    *Plaintiffs' allegations of a generalized company "policy" are insufficient to show that common issues will predominate* ................. 22

            2.    *Critical liability questions will require class-member-by-class-member analysis.* ..................... 28

                i.    Compensability ......................................... 29

                ii.    Knowledge ................................................. 34

                iii.    Damages .................................................... 36

        B.    A Class Action Is Not Superior .................................... 38

        C.    The District Court Erred In Concluding Plaintiffs Satisfied Rule 23 ................................................. 41

            1.    *The district court's logic squarely conflicts with* Bojangles. ................................................ 42

            2.    *The district court's analysis was far from "rigorous."* .......................................................... 43

II.   THE SAME ANALYSIS COMPELS THE
      DECERTIFICATION OF PLAINTIFFS' FLSA
      COLLECTIVE ACTION........................................................ 45

III.  EVEN IF PLAINTIFFS HAD MET THEIR BURDEN
      UNDER RULE 23 AND THE FLSA, THE DISTRICT
      COURT DEFINED AN OVERLY BROAD CLASS .............. 48

CONCLUSION ............................................................................... 51

REQUEST FOR ORAL ARGUMENT ........................................... 51

# TABLE OF AUTHORITIES

**CASES:**

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)................................................................21, 39

*Anderson v. Mt. Clemens Pottery Co.,*
    328 U.S. 680 (1946)..........................................................................32

*Arizona Christian Sch. Tuition Org. v. Winn,*
    563 U.S. 125 (2011)..........................................................................50

*Babineau v. Federal Express Corp.,*
    576 F.3d 1183 (11th Cir. 2009)................................................*passim*

*Castillo v. Bank of Am., NA,*
    980 F.3d 723 (9th Cir. 2020).............................................................33

*Clark v. A&L Homecare & Training Ctr., LLC,*
    68 F.4th 1003 (6th Cir. 2023) ..........................................................46

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013)............................................................................19

*Cornn v. United Parcel Serv., Inc.,*
    No. 03-cv-2001-TEH, 2005 WL 2072091 (N.D. Cal. Aug.
    26, 2005)..........................................................................................27

*D.T.M. ex rel. McCartney v. Cansler,*
    382 F. App'x 334 (4th Cir. 2010).......................................................45

*EQT Prod. Co. v. Adair,*
    764 F.3d 347 4th Cir. 2014 .....................................................*passim*

*Evans v. Chalmers,*
    703 F.3d 636 (4th Cir. 2012).............................................................46

*Ferreras v. American Airlines, Inc.,*
    946 F.3d 178 (3d Cir. 2019) ....................................................*passim*

*G.T. v. Board of Educ. of Cnty. of Kanawha,*
  117 F.4th 193 (4th Cir. 2024) ........................................................... 20

*Gariety v. Grant Thornton, LLP,*
  368 F.3d 356 (4th Cir. 2004) ..................................................... 21, 38

*Gregory v. Finova Cap. Corp.,*
  442 F.3d 188 (4th Cir. 2006) ............................................................ 18

*Harbourt v. PPE Casino Resorts Maryland, LLC,*
  820 F.3d 655 (4th Cir. 2016) ........................................................... 29

*Hatcher v. County of Hanover,*
  No. 3:23cv325, 2024 WL 3357839 (E.D. Va. July 10, 2024)......... 15, 44

*Hawkins v. Securitas Sec. Servs. USA, Inc.,*
  280 F.R.D. 388 (N.D. Ill. 2011) ....................................................... 36

*In re LifeUSA Holding Inc.,*
  242 F.3d 136 (3d Cir. 2001) ............................................................. 39

*In re Marriott Int'l, Inc.,*
  78 F.4th 677 (4th Cir. 2023) ............................................................ 38

*In re Zetia (Ezetimibe) Antitrust Litig.,*
  7 F.4th 227 (4th Cir. 2021) .............................................................. 36

*Killion v. KeHE Distribs., LLC,*
  761 F.3d 574 (6th Cir. 2014) ........................................................... 19

*Laboratory Corp. of Am. Holdings v. Davis,*
  605 U.S. ---, 145 S. Ct. 1608 (2025) ................................................ 33

*Mr. Dee's Inc. v. Inmar, Inc.,*
  127 F.4th 925 (4th Cir. 2025) .......................................................... 45

*Rapp v. Network of Cmty. Options, Inc.,*
  3 F.4th 1084 (8th Cir. 2021) ............................................................ 29

*Scott v. Chipotle Mexican Grill, Inc.,*
  954 F.3d 502 (2d Cir. 2020) ....................................................... 25, 30

*Seagram v. David's Towing & Recovery, Inc.*,
  62 F. Supp. 3d 467 (E.D. Va. 2014) .................................................... 22

*Stafford v. Bojangles' Restaurants, Inc*,
  123 F.4th 671 (4th Cir. 2024) ...................................................... *passim*

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ........................................................................ 50

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ........................................................................ 22

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) ........................................................ 40

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................ 20, 21, 40, 43

*Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*,
  453 F.3d 179 (3d Cir. 2006) ............................................................ 48

*Weckesser v. Knight Enters. S.E., LLC*,
  391 F. Supp. 3d 529 (D.S.C. 2019) .................................................. 47

*Windham v. American Brands, Inc.*,
  565 F.2d 59 (4th Cir. 1977) .............................................................. 36

*Zavala v. Wal Mart Stores Inc.*,
  691 F.3d 527 (3d Cir. 2012) ............................................................ 47

## CONSTITUTION AND STATUTES:

U.S. CONST.
  art. III, § 2, cl. 1 ............................................................................ 50

28 U.S.C.
  § 1292(e) ........................................................................................ 1
  § 1331 .............................................................................................. 1
  § 1367 .............................................................................................. 1

29 U.S.C.
    § 201 *et seq.* .............................................................. 7
    § 254 ......................................................................... 27

Virginia Overtime Wage Act, Va. Code
    § 40.1-29.2 ............................................. 7, 14, 22, 27

Virginia Wage Payment Act, Va. Code
    § 40.1-29 *et seq.* ........................................... 7, 14

## OTHER AUTHORITIES:

FED. R. APP. P.
    34(a)(2) ..................................................................... 51

FED. R. CIV. P.
    23(a) ......................................................................... 20
    23(b)(3) .............................................................. *passim*
    23(c)(1)(B) ............................................................... 48
    23(c)(1)(C) ............................................................... 45
    23(f) .................................................................... 1, 46

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over Plaintiffs'
Fair Labor Standards Act ("FLSA") claim under 28 U.S.C. § 1331, and
supplemental jurisdiction over Plaintiffs' state-law wage claims under 28
U.S.C. § 1367. This Court granted Anheuser-Busch's timely petition for
immediate appeal of the district court's class-certification order under
Federal Rule of Civil Procedure 23(f). This Court has jurisdiction under
that Rule and 28 U.S.C. § 1292(e).

## STATEMENT OF ISSUES

1.     Whether the district court erred in granting class certification
under Federal Rule of Civil Procedure 23(b)(3) based solely on Plaintiffs'
unsupported allegations of a generalized "policy" requiring employees to
work without pay.

2.     Whether the district court erred in denying Anheuser-Busch's
motion to decertify the FLSA collective action "for essentially the same
reasons" it granted class certification.

3.     In the alternative, whether the district court erred in defining
a general class of all Anheuser-Busch employees who worked at a
particular brewery within the relevant timeframe, without regard to
whether they were injured.

1

## INTRODUCTION

This appeal involves an order certifying a Rule 23(b)(3) class of employees pursuing so-called "off-the-clock" claims, *i.e.*, claims for time allegedly spent working beyond the employees' scheduled shift time. Plaintiffs—two hourly employees from Anheuser-Busch, LLC's Williamsburg, Virginia Brewery—filed this suit on behalf of themselves and a putative class of more than 500 current and former hourly employees. They allege that Anheuser-Busch has a secret "corporate policy" of requiring employees to work pre- and post-shift without pay, and that such claims could be proven class- and collective-wide using Anheuser-Busch's security badge swipe system (which records employees' total time spent on Brewery premises).

But discovery—including Anheuser-Busch's depositions of nine employees (including both named Plaintiffs), as well as expert analyses of swipe records—revealed critical differences in on-site pre- and post-shift activities among the potential class members. Some arrive at the Brewery long before their shift; others do not. Some spend their time pre-shift (after they have swiped in) getting coffee, going to the on-site gym or café, or chatting with coworkers; others do not. Practices also

vary pre- and post-shift, as well as among various roles, across the Brewery's five departments. And the variations extend even to each employee's own practices, most of which vary week-by-week, even shift-by-shift. In the words of one of the named Plaintiffs: "Everybody's different."

All these differences, moreover, went to the core issues in the case: (1) whether each employee's pre- or post-shift activities constituted work (and in what amount); (2) whether Anheuser-Busch knew or should have known that each employee worked without pay; and (3) how much damages (if any) each employee suffered. On class certification, the question posed was whether the documented differences presented common questions that would predominate over individualized ones—or instead whether Plaintiffs' allegations of a generalized, unwritten "policy" purportedly requiring unpaid work (in violation of Anheuser-Busch's actual policy requiring payment for *all* work), were enough to satisfy Rule 23(b)(3). Under this Court's recent decision in *Stafford v. Bojangles' Restaurants, Inc*, 123 F.4th 671 (4th Cir. 2024), the answer should have been simple: Plaintiffs' "conclusory assertions of some

highly generalized company policy to have [Brewery employees] work without pay" did not suffice. *Id.* at 680.

But the district court found the opposite and certified the class. In doing so, the court did not distinguish (or even cite) the recent *Bojangles* decision. Nor did the court acknowledge other on-point, published decisions from other circuits. In fact, the court offered little by way of analysis at all—just one superficial paragraph without a single citation to any record evidence or controlling precedent. The court also denied Anheuser-Busch's motion to decertify Plaintiffs' conditionally certified collective action "for essentially the same reasons." And to top it off, the district court crafted an overly general class definition that squarely conflicts with *Bojangles,* Rule 23's "core tenets," 123 F.4th at 680, and basic constitutional principles.

This Court should reverse.

## STATEMENT OF THE CASE

### A.    Factual Background

Anheuser-Busch is a brewing company based in St. Louis, Missouri, that operates multiple brewing and related facilities. JA301, at 110:13–111:4. The Brewery employs about 400 hourly employees at any given time, each of whom works in one of five main departments—(1) brewing,

4

(2) utilities, (3) quality assurance, (4) operations (which includes packaging and the warehouse), or (5) maintenance. JA486, at 22:12–14; JA281-282, at 29:14–36:7. Hourly employees swipe their badge at a security turnstile when entering and exiting the building through a set of doors referred to as the "employee entrance." JA311, at 152:4–10; JA312, at 156:10–16.[1]

The Brewery operates 24-hours-a-day, with employees working one of three 8-hour shifts: the 7:00 a.m. to 3:00 p.m. "[d]ay shift," the 3:00 p.m. to 11:00 p.m. "[a]fternoon shift," or the 11:00 p.m. to 7:00 a.m. "[m]idnight shift." JA281, at 29:22–30:4. Anheuser-Busch expects employees to be at their workstation at the start of their shift and work until the end of their shift. *See* JA320, at 186:7–187:22; *see also* JA785, at 25:20–22 (employee testifying that he was required to be in the Brewery only during his scheduled shift from 7:00 a.m. to 3:00 p.m.); JA896-897, at 81:21–82:1 (employee testifying that he was considered on time so long as he swiped in before his 7:00 a.m. start-of-shift time). This

---

[1] The policies and practices described in this section have been in place at all times relevant to this suit.

means employees must swipe into the Brewery building before their shift starts, and do not swipe out until their shift ends. JA1114, at 90:4–23.

Although Anheuser-Busch generally pays employees on an hourly basis for the shifts they work, its policy, reflected in the governing collective bargaining agreement, is to pay employees for *all* hours worked—*i.e.,* the "whole time," including when that time is pre- or post-shift. JA510, at 120:9–20; *see* JA314-315, at 163:18-165:3.

Thus, if an employee needs to work outside their shift, the employee is supposed to notify their manager, who will ensure the employee is "pa[id] *** for the time *** beyond [thei]r shift." JA511-512*,* at 124:5–125:17; *see also* JA314, at 163:18–164:19. Indeed, the record shows that Brewery employees received such compensation. *See* ECF No. 107, at 4-5 & n.8 (acknowledging that managers would sometimes approve their compensation for time outside their scheduled shift); JA728, at 108:8–12 ("Q: Are you aware of any instances in which you asked Anheuser-Busch to pay you for time that you worked outside of your shift, where Anheuser-Busch denied you your request? A: No. I do not remember that."). But not all employees chose to request it. *See* JA1227, at 259:20–260:12 (named Plaintiff testifying that she made a "conscious decision"

6

to not seek compensation from the Brewery for her alleged post-shift work).

### B. This Lawsuit

1. In November 2021, two hourly Brewery employees[2] sued Anheuser-Busch on behalf of themselves and similarly situated employees, alleging that Anheuser-Busch has a secret "corporate policy of failing to compensate Plaintiffs for all mandatory pre- and/or post-shift work." JA114-115 ¶ 2. Specifically, Plaintiffs alleged that Anheuser-Busch "requires Plaintiffs to arrive to work prior to [their shifts'] scheduled start time" and to stay after their shifts' scheduled end time "in order to perform a litany of tasks necessary to perform Plaintiffs' jobs," and fails to pay employees for that time. *Id.* Based on these allegations, Plaintiffs brought claims under the Virginia Wage Payment Act ("VWPA"), Va. Code § 40.1-29 *et seq.*, the Virginia Overtime Wage Act ("VOWA"), Va. Code § 40.1-29.2, and the FLSA, 29 U.S.C. § 201 *et seq.* JA129-134 ¶¶ 70–105.

---

[2] Abby Gearhart replaced Julie Glennon as one of the named Plaintiffs in Plaintiffs' first amended complaint. ECF No. 1, JA114.

Anheuser-Busch denied Plaintiffs' allegations, ECF No. 15, ECF No. 97, but consented to the "conditional certification" of a collective action for the FLSA claim—thus allowing the provision of court-approved notice to Brewery employees who were allegedly similarly situated to Plaintiffs. ECF No. 20.

**2.** Fast forward to discovery. Rather than revealing a "corporate policy" requiring unpaid pre- and post-shift work, discovery disclosed only one policy: that employees were to be paid for the "whole time" they worked, including when that time is pre- or post-shift. JA510, at 120:9–20; *see* JA314-315, at 163:18-165:3. Moreover, the evidence laid bare that Brewery employees are free to do what they want before and after their shifts, and that what they choose varies shift-to-shift, day-to-day, and person-to-person—thus precluding the possibility of any uniform pre- and post-shift "policy."

To start, the evidence showed that employees can arrive as early as they want and stay as late as they want. JA967, at 36:7–10 (employee who opted into the FLSA action testifying he was not aware of a time limit on how early employees can swipe in); JA411, at 94:3–20 (Brewery packaging director discussing various activities employees could do at the

8

brewery before or after working their shift). And employees take advantage of that—coming in at varying times on different days.

Indeed, Anheuser-Busch's swipe records showed that whether, when, and for how long even one employee arrives early or stays late fluctuates drastically. For example, an expert analysis of swipe-in and swipe-out records for the named Plaintiffs and two other employees who opted into the FLSA claim showed dramatic inter-employee differences (*e.g.*, Gearhart swiped in 11.98 minutes early on average, while South averaged more than twice that), as well as intra-employee differences (*e.g.*, Overby swiped in as little as 0 minutes early or as much as 55.22 minutes early):

| Difference between Scheduled Start and Swipe In (in Minutes) | | | | |
|---|---|---|---|---|
| Employee | Shift Count | Average | Minimum | Maximum |
| THOMAS OVERBY | 575 | 15.39 | 0 | 55.22 |
| FLOYD SOUTH | 736 | 24.83 | 1 | 35.85 |
| ABBY GEARHART | 678 | 11.98 | -2.48 | 33.57 |
| JULIE GLENNON | 196 | 16.49 | 6.1 | 42.02 |
| Note: Positive amounts indicate the employee was in the Brewery before their scheduled shift. Negative amounts indicate the employee entered the Brewery after their scheduled shift start. | | | | |

JA1159, at Attachment 2-A. And despite Plaintiffs' allegations of routine post-shift work, all four employees exited the facility on average less than four minutes after their shifts ended:

9

| Difference between Scheduled End and Swipe Out (in Minutes) | | | | |
|---|---|---|---|---|
| Employee | Shift Count | Average | Minimum | Maximum |
| THOMAS OVERBY | 575 | 2.18 | -24.93 | 60.07 |
| FLOYD SOUTH | 736 | 3.68 | 0.05 | 29.6 |
| ABBY GEARHART | 678 | 2.25 | -81.07 | 39.07 |
| JULIE GLENNON | 196 | 2.15 | -20.17 | 31.53 |

Note: Positive amounts indicate the employee was in the Brewery after their scheduled shift.  Negative amounts indicate the employee exited the Brewery before the scheduled shift end.

*See* JA1160, at Attachment 2-B.

What employees do after they swipe into the Brewery also varies. Many employees (including the named Plaintiffs) arrive early to chitchat with coworkers, eat breakfast, go to the gym—even all the above.  *See, e.g.*, JA1205, at 172:15–173:11 (named Plaintiff testifying that it was "pretty common" for employees to arrive significantly before their start of shift then go to the café, look on their phones, grab coffee, socialize, or go to the gym).  Others do not.  JA1206, at 175:18–176:4 (employee typically went straight to workstation upon arrival).

One employee who opted into the FLSA action, for example, testified that he is "not a guy who clock[ed] in and walk[ed] through the door and [wa]s ready to work."  JA1318, at 36:18–25.  Sometimes he would get to the Brewery up to an hour early, by choice.  JA1326, at 68:12–24.  "[S]ometimes *** [he] would go to the gym and work out, that

10

sort of thing." *Id.* Even the one consistent part of his routine had variation: the employee testified that he would always drink a cup of coffee outside until close to the start of his shift, but when exactly he returned inside fluctuated. *Id.* 68:25–70:2. In his words, "it can depend. It depends. I mean it really truly depends." JA1326-1327, at 69:21–70:2; see also JA1433, at 211:5–13 (named Plaintiff) (would socialize in the café or lunch area upon arrival "[i]f time permitted," but how often that happened "var[ied]"); JA787, at 31:20-33:2 (opt-in Plaintiff) (usually had a cup of coffee and a biscuit after swiping in but before starting work).

The employees who claim to have been required to complete work-related tasks outside their shift times admitted that whether such tasks were required, what the tasks were, how long the tasks took, and what was required pre- versus post-shift differed depending on both the day and specific job role. *See, e.g.*, JA1327, at 70:17–20; JA1331, at 87:19–24 (employee testifying that his pre-shift routines differed based on the job he was assigned and would vary day to day); JA1338, at 116:8–117:12 (testifying there were several instances where he did not perform post-shift work); JA786-787, at 28:1–33:2 (employee testifying that his pre-shift routines were different based on what job he was performing).

11

Anheuser-Busch's COVID-19 screening protocols also varied among employees and over time. For example, some employees went through the protocols before their shift, others during. *See* JA1647, at 138:21–139:12 (noting that several employees went through COVID procedures "after their scheduled start time").[3] The amount of time the procedures took on any given day fluctuated even for just one person. *See* JA1417, at 147:11–149:3 (named Plaintiff); *see also* JA797, at 70:21–23 (opt-in Plaintiff) (noting delays when "[s]ometimes [the scanner] didn't work"). And some putative class members never even experienced these procedures because they started at the Brewery after the COVID protocols ended. *See* ECF No. 107, at n.18.

To be sure, the employees' declarations and interrogatories tended to paint a more uniform picture. *See, e.g.*, JA30 ¶ 8 (named Plaintiff Overby averring that "I am required to arrive 15-20 minutes prior to the start of my scheduled shift to perform various essential job duties[.]"); JA43 ¶ 7 (named Plaintiff Gearhart averring that "Anheuser-Busch requires me to arrive approximately 10-20 minutes prior to the start of

---

[3] All agree that Anheuser-Busch pays employees for their entire shift. Thus, any employee who went through COVID procedures after the scheduled start of their shift was paid for that time.

12

my scheduled shift each day."). But the same employees' sworn deposition testimony contradicted those written representations. *See, e.g.*, JA1410, at 120:1–15 (Overby testifying that whether and when there were pre-shift "carryover" meetings, and how long they took, varied day to day); JA1197, at 138:7–22 (Gearhart clarifying that she was required to be at her job location only by her scheduled start-of-shift time). Expert analysis of the swipe record data confirmed those variations. For example, Todd Muir (an employee who opted into the FLSA claim) said in his interrogatories that he "had to be at the brewery about 10 to 15 minutes prior to the start of his shift each day." JA1562, at No. 13. But according to the swipe records, for 91.71% of his scheduled shifts, Muir swiped his security badge at the employee entrance less than 10 minutes before his shift, with an average swipe-in time of just 4.53 minutes before the start of his shift. JA1156-1157, at Exs. 1, 3.

At bottom, discovery showed that, when it comes to what Anheuser-Busch employees do after swiping in and before swiping out, "[e]verybody's different." JA1412, at 128:22–129:7 (named Plaintiff Overby).

13

**3.** In April 2024, Plaintiffs moved for class certification of their VWPA and VOWA claims under Rule 23(b)(3). *See* JA157, ECF No. 107. Anheuser-Busch opposed and cross-moved for decertification of Plaintiffs' conditionally certified FLSA collective action, arguing that there were no common issues susceptible of class-wide resolution, and that individualized inquiries will swamp any issues common to the putative class and collective such that Plaintiffs could not satisfy either Rule 23(b)(3)'s predominance and superiority requirements or the FLSA's "similarly situated" requirement. *See* JA872, ECF No. 116, ECF No. 117. Anheuser-Busch later filed a notice of supplemental authority, alerting the district court to this Court's just-issued decision in *Bojangles*, which affirmed that "[a]llegations of generalized policies are not usually sufficient for the purposes of class certification." 123 F.4th at 680; *see* JA1723. Plaintiffs' response "agree[d] that [*Bojangles*] is supplemental authority," but spent four pages trying to distinguish it. JA1746.

On March 27, 2025, the district court granted Plaintiffs' class certification motion. The court disposed of Anheuser-Busch's predominance arguments in just two sentences:

> With regard to predominance, despite Anheuser-Busch's protestations to the contrary, the Court agrees with the

14

> Plaintiffs that the overarching issue of Anheuser-Busch's alleged policy and practice with regard to paying hourly employees only for their scheduled shift times (absent special circumstances), despite requiring additional pre- and post-shift work, is the primary issue to be litigated. *See* Pls. Reply at 1 ("[E]ach class member, no matter who they were and how they went about beginning and ending their workday, was subject to identical violative policies and practices."). Such "common conduct" by Anheuser-Busch "bear[s] on the central issue in the litigation"—whether the proposed class members must receive compensation for required pre- and post-shift work. *Hatcher* [*v. County of Hanover*, No. 3:23cv325], 2024 WL 3357839, at *4 [(E.D. Va. July 10, 2024)] (quoting *EQT Prod. Co.* [*v. Adair*], 764 F.3d [347,] 366 [4th Cir. 2014]).

JA1760-1761 (first and second alterations in original). The court then waved away as "not *** serious" the trial manageability "problem" created by the "individual variations in the type and extent of pre- and post-shift work performed." JA1764. Anheuser-Busch's "arguments with regard to decertifying the FLSA collective action," the court said, "fail for essentially the same reasons that its arguments against Rule 23 certification fail." JA1766. The court thus, in the same order, certified a class of approximately 500 current and former Anheuser-Busch employees and denied Anheuser-Busch's motion for decertification. JA1758, JA1767-1768. The court cited neither *Bojangles* nor any of the on-point, out-of-circuit cases Anheuser-Busch discussed in its filings.

15

## SUMMARY OF ARGUMENT

**I.**    This Court should reverse the district court's grant of class certification.  Under Rule 23, Plaintiffs bore the burden of showing that there are common, aggregation-enabling issues, and that those issues are more prevalent or important than the non-common, individual issues. This Court made clear in *Bojangles* that allegations of a generalized "policy" of requiring unpaid work cannot satisfy this requirement. Plaintiffs needed to point to some specific documentation or concrete evidence, and could not rest on conclusory allegations.

Yet conclusory assertions about an Anheuser-Busch policy are all Plaintiffs offered.  That is hardly surprising:  discovery showed that Anheuser-Busch's *actual* policy is to pay for all hours worked, and no secret contradictory policy existed.  Instead, what an employee does pre- or post-shift, whether it is work-related, how long it takes, and whether it was ultimately compensated all varies based on the employee, the department, and the day.  Nor is there any uniform or consistent connection between when employees swipe in or out at the Brewery and when they work; while many arrive early or stay late to chitchat with coworkers, eat breakfast at the on-site café, or go to the on-site gym,

others do not. Those differences would make it impossible for a factfinder to resolve Plaintiffs' claims in one stroke. The most critical issues—whether an employee was engaged in compensable work, what Anheuser-Busch knew, and the appropriate amount of damages—will all need to be determined on an employee-by-employee, shift-by-shift basis.

The need for such individualized inquiries also means Plaintiffs could not satisfy Rule 23(b)(3)'s requirement that a class action be the superior method for adjudicating their claims. The court will have to either conduct hundreds of mini trials (which would be unmanageable), or allow Plaintiffs to rely on representative evidence (which would infringe on Anheuser-Busch's right to raise individual defenses).

In superficially concluding that class certification was nevertheless warranted, the district court made several mistakes. The court relied exclusively on Plaintiffs' unsupported allegations of a generalized "policy"—precisely what *Bojangles* forbade. And the court failed to grapple with—much less analyze rigorously—the main issues in the case, including the relevant record evidence.

**II.** The district court's denial of Anheuser-Busch's motion to decertify Plaintiffs' conditionally certified collective action is wrong "for

17

essentially the same reasons."  Although class certification and FLSA collective action certification are different, they overlap as to whether the case can be fairly adjudicated on a representative basis in a way that does not necessitate or devolve into a series of mini-trials.  And here, the same differences between employees that preclude class certification preclude FLSA collective action certification.  Because the district court offered no basis to deny decertification other than the flawed basis for granting certification, this aspect of its order should be reversed, too.

**III.**  In the alternative, the Court should vacate the class certification order and remand with instructions to redefine the class. The district court certified a single class of employees without differentiating the type of off-the-clock work class members performed— indeed, without any reference to whether a class member performed off-the-clock work at all.  Such an "overly general" class definition, which presumptively includes many members who were not even injured, runs afoul of *Bojangles*, Rule 23, and Article III of the U.S. Constitution.

## STANDARD OF REVIEW

This Court reviews both class-certification rulings and FLSA collective-action rulings for abuse of discretion.  *Gregory v. Finova Cap.*

*Corp.*, 442 F.3d 188, 190 (4th Cir. 2006); *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 580 (6th Cir. 2014). An abuse of discretion occurs when, among other reasons, the district court misapplies the correct legal standard. *See Bojangles*, 123 F.4th at 678 (In the class-certification context, "abuse of discretion occurs when a district court 'materially misapplies the requirements of Rule 23.'") (quoting *EQT Prod.*, 764 F.3d at 357).

## ARGUMENT

## I. PLAINTIFFS FAILED TO MEET THEIR BURDEN UNDER RULE 23

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). Such actions "can serve as an administrable vehicle favorable to the needs of all parties." *Bojangles*, 123 F.4th at 683. But they can also "ratchet liability to potentially ruinous levels and force companies to settle or bet the store. They may incentivize litigation with awards of large attorneys' fees at the same time class members may receive little more than a pittance." *Id.* at 678 (internal citations omitted). Simply put, class actions are susceptible to "serious abuses." *Id.*

19

Rule 23 wards against such abuses by outlining several rigorous requirements with which plaintiffs seeking to certify a class must comply. *Bojangles*, 123 F.4th at 678. First, plaintiffs must "demonstrate the four prerequisites of Rule 23(a): numerosity of parties, common questions of law or fact, typicality of claims or defenses of the representative parties, and adequacy of representation." *G.T. v. Board of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 202 (4th Cir. 2024). Then, if the action (like this one) purportedly falls within Rule 23(b)(3), plaintiffs also must show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

Rule 23 is not a "mere pleading standard," though. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "A party seeking class certification must *** be prepared to *prove*"—with evidence—that each of these requirements is "in fact" met. *Id.* (emphasis added and omitted); *accord EQT Prod.*, 764 F.3d at 357 ("[T]he party must present evidence that the putative class complies with Rule 23."). And courts must conduct

20

a "rigorous analysis" to ensure that they are. *Wal-Mart*, 564 U.S. at 350-351.

## A. Individualized Inquiries Will Swamp Any Issues Common To The Putative Class

Although there are serious doubts as to whether Plaintiffs identified common facts capable of class-wide resolution, *Wal-Mart*, 564 U.S. at 350, the simplest way to resolve this case starts and ends with Rule 23(b)(3)'s predominance requirement. Predominance "is necessarily intertwined with" commonality, *Bojangles*, 123 F.4th at 679, but predominance is "far more demanding," *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004). "While commonality serves to ask whether class-wide proceedings are *** possible, predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Bojangles*, 123 F.4th at 679 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). It requires "courts to give careful scrutiny to the relation between common and individual questions in a case," and assess whether plaintiffs proved that "common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual

issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Plaintiffs failed to make that showing.

> 1. *Plaintiffs' allegations of a generalized company "policy" are insufficient to show that common issues will predominate.*

The crux of Plaintiffs' claims is that Anheuser-Busch supposedly (1) failed to pay Plaintiffs for work performed before and after their scheduled shifts, and (2) knew (or at least should have known) that Plaintiffs were not being paid for that compensable work. *See* VA. CODE § 40.1-29.2 (premising unpaid-overtime liability on the "requirements of the federal Fair Labor Standards Act"); *Seagram v. David's Towing & Recovery, Inc.*, 62 F. Supp. 3d 467, 474 (E.D. Va. 2014) (FLSA requires plaintiff to prove, among other things, "(1) that he worked overtime hours without compensation; and (2) that the employer knew or should have known that he worked overtime but failed to compensate him for it."). Plaintiffs argued that if these contentions were adjudicated on a class-wide basis, common issues would predominate because the putative class members are all "subject to the same policy" of not paying employees for pre- and post-shift work. ECF No. 107 at 10; *see also id.* at 18.

This Court recently outlined in *Bojangles* how courts should approach class certification motions for wage disputes premised on an alleged "policy" to require unpaid work. Like here, the *Bojangles* plaintiffs filed a putative class action alleging that their employer had a secret policy of requiring unpaid off-the-clock work (despite the existence of an official policy requiring payment for all work). 123 F.4th at 676–677. The evidence ultimately revealed that, while many prospective class members "worked opening shifts and thus were subject to [an] Opening Checklist" detailing mandatory pre-shift tasks, there were "differences in the character and extent of [p]laintiffs' off-the-clock work." *Id.* at 677. The district court nonetheless found that plaintiffs had satisfied Rule 23(b)(3)'s predominance requirement because "all class members' claims originate[d] from the same alleged policies and practices, including [the] Opening Checklist." *Id.*

This Court held that was "legal error[.]" *Bojangles*, 123 F.4th at 678. "Allegations of generalized policies," the Court explained, "are not usually sufficient for the purposes of class certification." *Id.* at 680. Such references "may mask a multitude of disparities," and may mean plaintiffs "are at a loss for a more specific thread to tie [their] claims

together." *Id.* Thus, plaintiffs (and courts) must identify "something more than conclusory assertions of some highly generalized company policy to have shift managers work without pay." *Id.*

*Bojangles* is no outlier; on-point, published precedent from around the country embraces the same rationale. For example, in *Ferreras v. American Airlines, Inc.*, the Third Circuit found that a suit alleging unpaid off-the-clock work based on a timekeeping system—including allegations that the employer had "a policy that discourages employees from seeking exceptions for work done outside of their shifts"—did not "satisfy even the commonality standard." 946 F.3d 178, 185 (3d Cir. 2019). The case could "not proceed as a class action because determining when each employee was actually working w[ould] necessarily require individualized inquiries," given "conflicting evidence about whether they were working the entire time they were clocked in." *Id.* at 180, 186. And because the plaintiffs' claims were, "at bottom, that they were not paid overtime compensation for hours worked," the alleged "policy regarding exceptions" could not drive resolution of the claims, either. *Id.* at 185. Thus, neither commonality nor predominance could "be established." *Id.* at 186–187.

24

Similarly, in *Babineau v. Federal Express Corp.*, the Eleventh Circuit affirmed the denial of class certification in a suit alleging that an employer had a "policy of failing to pay hourly employees for all time worked." 576 F.3d 1183, 1185 (11th Cir. 2009). Discovery had revealed "various non-work-related activities that took place" pre- and post-shift as well as "the various personal reasons that employees listed for coming in early and staying late." *Id.* at 1192. According to the Eleventh Circuit, the "existence of a policy requiring or encouraging employees to arrive early or stay late would not predominate [over] individualized issues. Even if [the employer's] policies pressured some employees to arrive early or stay late, it is clear from the record that other employees did so voluntarily and for purely personal reasons." *Id.* at 1193. Thus, as in *Bojangles* and *Ferreras*, predominance was not satisfied. *Id.* at 1194; *see also Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 513–514 (2d Cir. 2020) (similar).

*Bojangles*'s logic maps onto this case perfectly. As in *Bojangles*, Plaintiffs offered no evidence of a generalized company "policy" of working without pay. Nor could they. The only "policy" reflected in the record is that Anheuser-Busch paid employees for *all* hours worked—*i.e.*,

the "whole time," including time worked pre- or post-shift. JA510, at 120:9–20; *see* JA314-315, at 163:18-165:3. Proving the point, evidence showed that employees could request (and, in fact, received) compensation for time worked outside their scheduled shifts. JA511-512*, at 124:5–125:17; *see also* JA314, at 163:18–164:19; ECF No. 107, at 4-5 & n.8. The lone "policy" disclosed in the record, then, creates no common issue of uncompensated time across the employee population.

Indeed, the only relevant difference between *Bojangles* and this case is that Plaintiffs here offered even *less* evidence of a "generalized company policy" than the plaintiffs did in *Bojangles*. Plaintiffs did not show any "equivalent of the Opening Checklist" at issue in that case. 123 F.4th at 680. Instead, all Plaintiffs pointed to was Anheuser-Busch's "policy" that employees had to swipe in and out of the Brewery. *See, e.g.*, ECF No. 107 at 17-18; ECF No. 119 at 8–9. Yet Plaintiffs admitted the swipe system tracks only when employees *enter and leave* the Brewery premises, not when they are working. *See, e.g.*, JA1395, at 58:7–17 (acknowledging that he did not start working immediately "after check-in, after clock-in"). As one opt-in Plaintiff stated: The "time that you

26

arrive at work is *totally different* than the time you actually start performing work activities." JA965, at 34:2–15 (emphasis added).

Moreover, swiping in and out of the Brewery does not constitute work—much less suggest a violation of Virginia wage laws. Time spent on an employer's premises is not, on its own, a measure of whether such time constitutes compensable work. *See* 29 U.S.C. § 254; VA. CODE § 40.1-29.2 (premising unpaid-overtime liability on the "requirements of the federal Fair Labor Standards Act *** as amended"); *see also Cornn v. United Parcel Serv., Inc.*, No. 03-cv-2001-TEH, 2005 WL 2072091, at *4 (N.D. Cal. Aug. 26, 2005) ("Plaintiffs have failed to cite any authority for the proposition that time spent punching in must be counted as part of hours worked under California law."). Thus, unlike evidence about the Opening Checklist, evidence about Anheuser-Busch's swipe system does not demonstrate any "policy" of requiring unpaid work or "resolve" any aspect of Plaintiffs' claims. *Bojangles*, 123 F.4th at 679-680; *see also Ferreras*, 946 F.3d at 185 ("[W]hether hourly-paid *** employees *** are not being compensated for all hours worked *** cannot be answered by common evidence about the timekeeping system because a yes or no

answer tells us nothing about actual common work habits, if there are any.").

At bottom, Plaintiffs offered "no specific documentation or concrete evidence narrowing the[ir] broad theoretical policy by which [Anheuser-Busch] allegedly mandate[s] all different forms of off-the-clock work." *Bojangles*, 123 F.4th at 680. That should have been the death knell for Plaintiffs' class certification motion.

2. *Critical liability questions will require class-member-by-class-member analysis.*

Even beyond their failure to point to concrete evidence contradicting Anheuser-Busch's *actual* policy, the discovery evidence proved that Anheuser-Busch could not have had a secret policy requiring off-the-clock work. Given the vast differences in what the proposed class members did pre- and post-shift, no policy requiring unpaid work could be proven circumstantially. Instead, a factfinder would need to assess evidence specific to each proposed class member to decide whether each class member's pre- or post-shift activities on any given day constituted "work," whether Anheuser-Busch knew that class member was not paid for that day's work, and what that class member's damages are. Rule 23(b)(3)'s predominance requirement "cannot be established" in these

circumstances. *Ferreras*, 946 F.3d at 186-187 (concluding "predominance c[ould] not be established" where "employees would need individualized, not representative, evidence to prove their case"); s*ee EQT Prod.*, 764 F.3d at 366 ("The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation."). As explained below, no common proof could provide meaningful answers to the critical liability and damages questions in this case.

### i. Compensability

Take first whether Plaintiffs were in fact engaging in compensable "work" pre- and post-shift—an essential element of Plaintiffs' claims. *See Harbourt v. PPE Casino Resorts Maryland, LLC*, 820 F.3d 655, 658 (4th Cir. 2016); *Rapp v. Network of Cmty. Options, Inc.*, 3 F.4th 1084, 1087 (8th Cir. 2021) (an employee bringing an unpaid-overtime claim must first prove that they have "performed compensable work"). Courts have consistently found that, for wage claims like Plaintiffs', variations in what putative class members did during allegedly compensable time, and disparities in the amount of time involved, prevent courts from determining whether a particular class member actually "performed

work during the interval in question without undertaking individualized inquiries that predominate over common questions." *Babineau*, 576 F.3d at 1192; *see Scott*, 954 F.3d at 513–514 (affirming denial of class certification because the plaintiffs' testimony about their primary job responsibilities and work activities varied). In *Ferreras*, "[f]or example, some employees testified that they began working immediately after clocking in. Others testified that they chatted with co-workers or watched TV after clocking in but before their shifts began. Thus, whether they were actually working pre- and post-shift [wa]s an open and inherently individualized question." 946 F.3d at 186.

Here, Plaintiffs cited a handful of boilerplate declarations in support of their contention that Anheuser-Busch employees had to do some pre- and post-shift work. But even assuming the assertions in the declarations are true, the record clearly shows that there are significant variations even on a *per-employee* basis regarding (1) *when* each employee swiped in on a given day and (2) *what* they were doing between swiping in/out and their shift. Thus, the differences *between* putative class members—including those performing different job functions across

30

the Brewery's five departments—are enormous, and cannot be adjudicated class wide.

For example, named Plaintiff Abby Gearheart recognized that her pre-shift routine differed from others. She testified that, "for the most part," it was not her practice to socialize in the café, but it was "pretty common" for other employees to arrive early and socialize. JA1205-1206, at 172:15–176:4. Meanwhile, the other named Plaintiff, Thomas Overby, testified that he would socialize in the café or lunch area upon arrival "[i]f time permitted," but how often that happened "var[ied]." JA1433, at 211:5–13. Michael Easterling, an employee who opted into the FLSA action, would try to get in "about an hour ahead of schedule," but the exact time could vary given traffic. JA1318, at 36:15–22. Once he got there, he would sometimes socialize with coworkers, "[s]ometimes *** go to the gym and work out, that sort of thing." JA1326, at 68:20–24. His days were not uniform. And opt-in Plaintiff Ronald Brinson arrived 10 to 15 minutes early. JA786, at 28:17–21. What he did when he got there was different when he was a maintenance technician (where he had to put on personal protective equipment and meet with the technician coming off shift) versus when he was a tech planner (where he did not).

JA786-787, at 28:24–30:6. The amount of time any of his tasks took varied by day. JA787, at 30:20–24. Still, he found time to "[g]et a cup of coffee, have [himself] a biscuit or something," and talk to coworkers. *Id.* 31:20–32:4. In his own words, those 10 to 15 minutes were "kind of free time." *Id.* 32:18-21. Just looking at the evidence as to these four putative class members, there is no common or typical set of facts upon which the Court could render a decision that would be applicable to each—let alone to the entire putative class.

Plaintiffs' testimony revealed that Anheuser-Busch's COVID-19 policies also had significant variations. The policies did not take place "pre-shift" for everyone: some putative class members went through the screening protocol "after their scheduled start time"—*i.e.*, during their shift (for which they were indisputably paid). JA1647, at 138:21–139:12. The amount of time the procedures took, including whether it was more than de minimis, varied both over the course of the pandemic and based on daily variations—like how many other people were waiting to be screened, how many screeners there were, and whether the scanner was working. *See* JA1417, at 147:11–149:3; JA795, at 64:9–14, JA797, at 70:21–23; *cf. Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692

(1946) ("It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved."). And some putative class members never experienced the COVID protocols at all because they started at the Brewery after the protocols were removed in February 2022. *See* ECF No. 107, at 7 n.18. Yet Plaintiffs successfully sought to certify a class of "*[a]ll* individuals who are currently, or were formerly, employed" at the Brewery since July 1, 2020. *Id.* at 3 (emphasis added); *see also Castillo v. Bank of Am., NA*, 980 F.3d 723, 732 (9th Cir. 2020) ("Castillo has sought to certify a class that fails predominance, because many of its members were never exposed to the challenged formulas or, if they were, were never injured by them"); *see also Laboratory Corp. of Am. Holdings v. Davis*, 605 U.S. ---, 145 S. Ct. 1608, 1611 (2025) (Kavanaugh, J., dissenting from dismissal as improvidently granted) ("A damages class consisting of both injured and uninjured members does not meet [Rule 23's] requirement" that "common questions of law and fact predominate.").

In short, "Plaintiffs will have to offer individualized proof to show that they were actually working during the various time periods at issue, the main point of dispute in this case." *Ferreras*, 946 F.3d at 186.

33

ii.     Knowledge

The "knowledge" element of Plaintiffs' unpaid-overtime claims fares no better. Plaintiffs seemed to assume that the existence of Anheuser-Busch's swipe system would necessarily prove that Anheuser-Busch knew or should have known that its employees were not being properly compensated. ECF No. 119 at 10–11. But as explained above, employees engage in different activities in the gap periods between their shifts and swiping in or out. Hence the swipe system does not provide any answer—much less a common answer—with regard to Anheuser-Busch's knowledge. Put another way, Anheuser-Busch does not "know" based on swipe records that an employee who swipes in up to an hour early to go to the gym is performing compensable work. JA1318, at 36:15–22, JA1326, at 68:20–24.

Meanwhile, the evidence that actually bears on knowledge varied per employee. Plaintiffs' motion acknowledged that managers would approve their compensation for time outside their scheduled shift when requested. ECF No. 107, at 4 (acknowledging employees were paid for pre- or post- shift work approved by a manager); *id.* at 5 n.8. And though some putative class members testified that their managers directed them

to work pre- or post-shift, *e.g.*, JA1394, at 56:4–57:2 (named Plaintiff) (testifying that he "had to arrive to work 15 to 20 minutes *** earl[y]" and do certain tasks), others did not, *see, e.g.*, JA1101, at 41:13–20 (opt-in Plaintiff) (testifying that no one required her to come in early for carryover meetings); JA724-725, at 89:18–93:1 (opt-in Plaintiff) (similar).

In fact, several Plaintiffs testified that no one was aware that they worked off-the-clock for the time they are claiming in this suit. JA1112, at 85:18–23 (opt-in Plaintiff) ("Q: Did you ever notify anyone that you stayed an extra ten minutes? A: No, I did not. Q: So no one was aware you worked the extra ten minutes, correct? A: No."); JA1227, at 259:20–260:12 (named Plaintiff) (testifying that she made a "conscious decision" to not seek compensation from the Brewery for her alleged post-shift work); JA728, at 108:8–12 (opt-in Plaintiff) ("Q: Are you aware of any instances in which you asked Anheuser-Busch to pay you for time that you worked outside of your shift, where Anheuser-Busch denied you your request? A: No. I do not remember that.").

Such differences preclude resolving Anheuser-Busch's purported knowledge on a class-wide basis. Whether an employer suffered or permitted work by one employee who was never told to arrive fifteen

35

minutes early "presents a far different question than that presented by" another employee "who was specifically instructed to arrive fifteen minutes early and always did so." *Hawkins v. Securitas Sec. Servs. USA, Inc.*, 280 F.R.D. 388, 399 (N.D. Ill. 2011); *see Bojangles*, 123 F.4th at 680 (stressing the "distinct questions" varying factual scenarios would present).

### iii. Damages

Damages calculations will require individual inquiries, too. Although "the existence of individualized claims for damages seems to offer no barrier to class certification" when the damages computation is "virtually a mechanical task," the "damage aspect of the case predominate[s]" when the calculation will "require[] separate mini-trial[s]." *Windham v. American Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977) (alterations and internal quotation marks omitted); *see also In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 237 (4th Cir. 2021) ("Predominance also applies to damages because the efficiencies of the class action mechanism would be negated if questions of individual damage calculations overwhelm questions common to the class.") (internal quotation marks, alterations, and ellipsis omitted).

36

That is the situation here. Determining the amount of even one employee's alleged damages would require first determining, shift-by-shift, whether and how much time they were onsite performing compensable work Anheuser-Busch knew about, which in turn can be determined only by understanding what each employee, across five different departments, was doing every day from July 2020 to the present. As a result, individual damages mini-trials will be required. Even if some class members performed uncompensated work, there is no typical or common set of facts upon which the Court could rely to make that determination class-wide. Nor is there a way to mechanically calculate the allegedly non-compensated time, as Anheuser-Busch's swipe system and the records thereof answer only whether an employee was onsite, not whether she or he was actually working. Put simply, this is not a situation where all variables to the damages equation are known for each plaintiff, such that the Court can simply do the math for each class member. Rather, the unknown variable is the time (if any) spent allegedly working without compensation pre- or post-shift.

*     *     *

In sum, the evidence showed that the most critical issues in Plaintiffs' case will need to be determined employee-by-employee, day-by-day, shift-by-shift. Such individualized inquiries will undoubtedly "swamp[]" the "adjudication of Plaintiffs' claims on a class basis." *Babineau*, 576 F.3d at 1191. Plaintiffs therefore cannot meet Rule 23(b)(3)'s "demanding" predominance test. *Gariety*, 368 F.3d at 362.

## B.  A Class Action Is Not Superior

Plaintiffs failed to satisfy Rule 23(b)(3) for a second reason: the need for individual inquiries means Plaintiffs cannot prove that class adjudication is superior.

Rule 23(b)(3)'s superiority requirement ensures that a class action is the best available method "for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). The Rule requires courts to "consider whether the efficiency gains of certification outweigh the fact that individualized issues requiring significant time and attention remain for later." *In re Marriott Int'l, Inc.*, 78 F.4th 677, 689 (4th Cir. 2023). Although the Rule lists out a variety of relevant factors, they are not exhaustive; the "polestar" is whether the "controversy, if tried as a

class action, could be efficiently and fairly managed." *In re LifeUSA Holding Inc.*, 242 F.3d 136, 148 (3d Cir. 2001); *see also Amchem Prods.*, 521 U.S. at 615 ("In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'") (ellipsis omitted).

If this case proceeds as a class action, Anheuser-Bush will be forced to defend itself at an unfair trial consisting of either (i) hundreds of plaintiff-by-plaintiff mini trials to assess whether and for how long any one of the roughly 500 individual employees engaged in compensable work outside of his or her shift, whether they were compensated, what Anheuser-Busch's knowledge was, and what any resulting damages are; or (ii) "representative" (*i.e.*, generalized) evidence of liability. The first type of trial is unmanageable (for the reasons outlined above). The second, given the vast differences between putative class members, will be fundamentally unfair. Indeed, such a trial would give Plaintiffs a pass on their burden of proof and deny Anheuser-Busch its right to present

39

individual defenses. *See Wal-Mart*, 564 U.S. at 367 (rejecting use of representative evidence where defendant would "not be entitled to litigate its statutory defenses to individual claims").

Plaintiffs refused to acknowledge these problems, much less offer any solution. They never provided a trial plan, which "often go[es] a long way toward demonstrating that manageability concerns do not excessively undermine the superiority of the class action vehicle." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1279 n.20 (11th Cir. 2009). They offered no statistical data, nor any formula purporting to establish on a class-wide basis either the existence or amount of compensable work performed.

To be sure, after Anheuser-Busch pointed out these problems, Plaintiffs eventually attached "initial" expert declarations to their class-certification *reply* brief. ECF No. 119, at 12. But the declarations offered no solution to the manageability problems. One expert (David Kern) explained how he would determine damages on a collective basis. *See* JA1689. But he did not review any of the above-cited depositions taken in this case, and thus (like Plaintiffs themselves) wrongly assumed that he could rely entirely on Anheuser-Busch's swipe system as evidence for

when Plaintiffs worked.  JA1691-1692, ¶ 17, JA1696-1697, ¶ 47, JA1697, ¶ 53.  Again, an employee's badge-swipe records, standing alone, show only when an employee entered and left the Brewery—they say nothing about whether that individual worked before or after their shift.  *See supra*, pp. 26-28.  Meanwhile, the other expert (Brian Grieser) explained how he *would* conduct a study to monitor employees' conduct—but he had yet to actually do so.  *See* JA1709.

In the end, all Plaintiffs gave the district court was their summary assurance (without any proof) that this case is "readily manageable." ECF No. 107, at 19.  But the actual record begged to differ.  Plaintiffs' motion should have been denied on superiority grounds, too.

## C.  The District Court Erred In Concluding Plaintiffs Satisfied Rule 23

The district court nevertheless granted class certification, concluding that "common issues" will "predominate" because there is an "alleged" Anheuser-Busch "policy" of requiring unpaid pre- and post-shift work, and that "individual variations in the type and extent of pre- and post-shift work performed" are "not *** so serious" as to present trial manageability concerns.  JA1760-1761, JA1764.  That logic was deeply flawed.

41

*1.   The district court's logic squarely conflicts with* Bojangles.

First, and most obviously, basing a predominance finding an "alleged policy" is in the teeth of the controlling *Bojangles* opinion. JA1760.  As explained above, *Bojangles* held that class certification "require[s] *something more* than conclusory assertions of some highly generalized company policy to have [employees] work without pay."  123 F.4th at 680 (emphasis added).

But that "something more" is wholly lacking from the district court's order (and from the record).  In fact, the district court's order did not consider *Bojangles* at all.  Plaintiffs themselves effectively conceded that error by moving the district court to "clarify" that it considered the case.  In their own words, the court's failure to "cite or discuss *Bojangles*" was a "mistake" warranting "correct[ion]."  ECF No. 134, at 4-5.

The district court's order also conflicts with Anheuser-Busch's other cited cases from around the country.  Anheuser-Busch "submitted evidence that employees punch[] in [at the Brewery] at different times and for different reasons."  *Babineau*, 576 F.3d at 1188.  "[E]mployees [a]re not always working while clocked in and there [i]s substantial variability in what they *** do[], even if some of it could be called work."

42

*Ferreras*, 946 F.3d at 186–187.   Thus, the "adjudication of Plaintiffs'
claims on a class basis would be swamped by individual factual inquiries
into the activities of each employee" before and after their shift, and
predominance cannot be satisfied.   *Babineau*, 576 F.3d at 1191.   The
district court—which never cited, much less engaged with any of these
cases—misapplied Rule 23(b)(3) by concluding otherwise.

### 2.  *The district court's analysis was far from "rigorous."*

The district court not only ignored the holding from *Bojangles* and
the other cited authority; it barely engaged with Anheuser-Busch's
arguments or the record evidence at all.   Although "[i]t is the plaintiffs'
burden to demonstrate compliance with Rule 23, *** the district court
has an independent obligation to perform a 'rigorous analysis' to ensure
that all of the prerequisites have been satisfied." *EQT Prod.*, 764 F.3d at
358 (quoting *Wal-Mart,* 564 U.S. at 351).   Specifically, "[p]rior to
certifying a class, a district court must definitely determine that the
requirements of Rule 23 have been satisfied, even if that determination
requires the court to resolve an important merits issue." *Id.* at 361.

No such analysis was performed here.   As even the district court
acknowledged, the "lion's share of [Anheuser-Busch's] briefing"

43

concerned Rule 23(b)(3)'s predominance requirement.  JA1759.  But the court barely addressed that point.  It cited no controlling authority; instead, the court disposed of the issue in a single, superficial paragraph, citing only Plaintiffs' reply brief and one unpublished district court decision.  JA1760-1761 (quoting *Hatcher*, 2024 WL 3357839, at \*4). Nowhere did the district court analyze the mountains of evidence showing material differences in Brewery employees' pre- and post-shift activities—including expert reports about the Brewery's swipe records and deposition testimony from named and opt-in Plaintiffs alike.  The district court thus never considered the fact that swipe records show that whether, when, and for how long even one employee arrives or stays late fluctuates drastically.  *See* JA1156, at Exs. 1–2; JA1159-1160, at Attachments 2-A-B.

Nor did the district court meaningfully grapple with the profound—likely insuperable—trial manageability and superiority issues Anheuser-Busch raised.  *See* FED. R. CIV. P. 23(b)(3) (plaintiffs' burden to show class "is superior to other available methods for fairly and efficiently adjudicating the controversy").  Instead, the court waved away the fact that "individual variations in the type and extent of pre- and

44

post-shift work performed could expand the required litigation," concluding it was enough for Plaintiffs to "*contend* that representative evidence and time and damages models will assist in the manageability of the litigation." JA1764 (emphasis added). But when a plaintiff fails to meet its burden, the proper course is to deny class certification (with or without prejudice)—not to grant it based on a pledge that expert evidence might someday allay legitimate manageability concerns. *See* FED. R. CIV. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *see, e.g.*, *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 928 (4th Cir. 2025) (noting that "[t]he district court denied plaintiffs' first two motions for class certification without prejudice"); *D.T.M. ex rel. McCartney v. Cansler*, 382 F. App'x 334, 336 (4th Cir. 2010) ("The district court *** denied the class-certification motion without prejudice to Plaintiffs' right to refile the motion after further discovery."). Plaintiffs' bare assurances were no basis to grant certification.

## II.    THE SAME ANALYSIS COMPELS THE DECERTIFICATION OF PLAINTIFFS' FLSA COLLECTIVE ACTION

The district court's Rule 23 errors bled into its analysis of Anheuser-Busch's motion to decertify Plaintiffs' conditionally certified

collective action. Indeed, in the same order granting class certification, the district court denied Anheuser-Bush's decertification motion "for essentially the same reasons." Order 14.[4]

The process for Rule 23 class certification and FLSA collective action certification is different, but the standards are at least "somewhat overlapping." *Bojangles*, 123 F.4th at 678 n.1. To assess whether the named plaintiffs and opt-in plaintiffs can proceed as a collective under the FLSA, courts often proceed in two steps. The first, known as "conditional certification," allows a district court to "facilitate notice of an FLSA suit to other employees upon a 'modest factual showing' that they are 'similarly situated' to the original plaintiffs." *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1008 (6th Cir. 2023).[5] At the second step, defendants can file a motion to decertify the collective, at which

---

[4] This Court may review the district court's decertification decision because it is part of the same "order" this Court granted Anheuser-Busch permission to appeal. FED. R. CIV. P. 23(f) (authorizing courts of appeals to permit an appeal from "an order" that "grant[s] or den[ies] class-action certification"). In addition, this Court independently has pendent appellate jurisdiction to review the FLSA decertification decision, which is "inextricably intertwined with" the Rule 23 class certification decision. *Evans v. Chalmers*, 703 F.3d 636, 658 (4th Cir. 2012).

[5] Given this lenient standard, Anheuser-Busch consented to conditional certification, while reserving its rights to challenge the case proceeding as a collective action at a later stage. ECF No. 20 at 4.

point plaintiffs "must show by a preponderance of the evidence that they are similarly situated." *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 534 (3d Cir. 2012). "Courts have identified a number of factors to consider at this [second] stage[.]" *Weckesser v. Knight Enters. S.E., LLC*, 391 F. Supp. 3d 529, 532 (D.S.C. 2019) (first alteration in original). But as the district court acknowledged, as with the predominance inquiry, the "broad focus" is "on the similarity of the plaintiffs' claims in relation to their differences." JA1766.

Here, Plaintiffs could not meet their burden under the FLSA for the same reason they could not meet their burden under Rule 23: the evidence developed in discovery showed that whether and how much an employee worked pre- or post-shift varied widely day-by-day even for just an individual employee—and even more so between employees. *See supra*, pp. 8-13. Put simply, "[t]he similarities among the proposed plaintiffs are too few, and the differences among the proposed plaintiffs are too many." *Zavala*, 691 F.3d at 537-538. Plaintiffs thus "failed to satisfy the 'similarly situated' standard." *Id.* at 537.

In concluding otherwise, the district court once again relied exclusively on Anheuser-Busch's alleged "policy" of requiring unpaid

47

work. But such logic fails in the FLSA context for the same reason it fails under Rule 23: not only did Plaintiffs fail to offer any specific or concrete evidence of such a policy, the evidentiary record in fact proved no policy exists. *See supra*, pp. 22-38. The Court should thus reverse the district court's decertification decision "for essentially the same reasons" it should reverse the district court's class certification decision.

## III. EVEN IF PLAINTIFFS HAD MET THEIR BURDEN UNDER RULE 23 AND THE FLSA, THE DISTRICT COURT DEFINED AN OVERLY BROAD CLASS

At a minimum, this Court should vacate the district court's class certification order with instructions to craft a narrower class definition. "Rule 23(c)(1)(B) requires that [a]n order that certifies a class action must define the class and the class claims, issues, or defenses." *Bojangles*, 123 F.4th at 680–681 (alteration in original). This means the certification order "must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Id.* at 681 (quoting *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187 (3d Cir. 2006)). "This requirement is no mere formality. Rather, it aids class

48

members in deciding whether to opt out of a class and facilitates appellate review." *Id.*

In *Bojangles*, this Court held that the district court erred in certifying classes whose "sole defining characteristic is that they contain Bojangles shift managers who worked for the company during a three-year period," without any reference "to the type of off-the-clock work class members performed or whether a class member even performed off-the-clock work *at all*." 123 F.4th at 681; *see id.* ("Simply being at a place of employment is, without more, unedifying."). Such an "overly general class definition[]," this Court said, "run[s] afoul of Rule 23's core tenets." *Id.* at 680.

The error here is identical. The district court certified a class of "[a]ll individuals who are currently, or were formerly, employed at Anheuser-Busch's Williamsburg brewery as non-exempt employees subject to Anheuser-Busch's LTM timekeeping system at any time from July 1, 2020, through the date of final disposition of the action." Add. 15. As in *Bojangles*, "[t]he sheer breadth of the class definition[] here bespeaks underlying flaws with the class['s] commonality, predominance, and typicality." 123 F.3d at 681. By simply "presum[ing], without more,

49

that all [employees] who worked within the relevant timeframe have a viable claim against" Anheuser-Busch, "the district court risked including individuals who would not have a right to recovery but for the sweeping scope of the class certification itself." *Id.*

What's more, affirming such a definition would raise serious Article III concerns. Article III limits federal court jurisdiction to "[c]ases" and "[c]ontroversies," U.S. CONST. art. III, § 2, cl. 1, which exist only when the plaintiff has standing—*i.e.*, "a 'personal stake' in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Yet the district court's class definition presumptively sweeps in employees who never worked without pay—and who thus have no "stake" at all. *See Arizona Christian Sch. Tuition Org. v. Winn,* 563 U.S. 125, 146 (2011) ("In an era of frequent litigation [and] class actions, *** courts must be more careful to insist on the formal rules of standing, not less so.").

Accordingly, even if the Court does not reverse the Rule 23 class certification and FLSA decertification rulings in their entirety, it should at a minimum vacate and remand for narrowing the class parameters.

**CONCLUSION**

For all these reasons, this Court should reverse the district court's order.

**REQUEST FOR ORAL ARGUMENT**

Counsel for Anheuser-Busch respectfully request oral argument. This case raises important issues regarding Rule 23's commonality, predominance, and superiority requirements, FLSA standards, and the application of this Court's precedent addressing those requirements. Counsel for Anheuser-Busch submit that oral argument will assist this Court's decisional process—particularly its evaluation of the factual record. *See* FED. R. APP. P. 34(a)(2).

Dated: July 1, 2025

Respectfully submitted,

*/s/ James E. Tysse*
James E. Tysse
Robert G. Lian, Jr.
Margaret O. Rusconi
Katherine I. Heise
AKIN GUMP STRAUSS
   HAUER & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
202-887-4000
jtysse@akingump.com

*Counsel for Defendant-Appellant Anheuser-Busch, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,761 words, excluding the parts of the brief exempted by the Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Century Schoolbook font.

*/s/ James E. Tysse*
James E. Tysse

Dated: July 1, 2025